UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTONIO DAVIS,

                    Petitioner,                    Case No.  2:14-cv-10019
                                                              Hon. Paul D. Borman

v.

ROBERT NAPEL,[1]

                    Respondent.
_____/

**OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS
CORPUS, (2) DENYING CERTIFICATE OF APPEALABILITY, AND (3)
GRANTING PERMISSION TO APPEAL IN FORMA PAUPERIS**

This is a habeas case filed by a Michigan prisoner under 28 U.S.C. § 2254.

Petitioner Antonio Davis was convicted after a jury trial in the Wayne Circuit Court of

second-degree murder, MICH. COMP. LAWS § 750.317, possession of a firearm by a felon,

MICH. COMP. LAWS § 750.224f, and possession of a firearm during the commission of a

felony (felony-firearm), MICH. COMP. LAWS § 750.227b. Petitioner was sentenced to 315-

to-600 months for the murder conviction, 22-to-60 months for the felon in possession of a

firearm conviction, and a consecutive two-year term for the felon-firearm conviction. The

petition raises eight claims: (1) Petitioner was denied the effective assistance of counsel at

_____

[1]Petitioner has been transferred to the Marquette Branch Prison.  The only proper
respondent in a habeas case is the habeas petitioner's custodian, which in the case of an
incarcerated habeas petitioner is the warden of the facility where the petitioner is
incarcerated. See *Edwards v. Johns*, 450 F. Supp. 2d 755, 757 (E.D. Mich. 2006); See
also Rule 2(a), 28 U.S.C. § 2254.  Therefore, the Court substitutes Warden Robert Napel
in the caption.

trial for his failure to interview a defense witness, (2) Petitioner's counsel was ineffective for consenting to the substitution of trial judges, (3) the prosecutor committed misconduct, (4) the trial court erroneously admitted a recording of the 9-1-1 call, (5) the trial court erroneously instructed the jury on second-degree murder, (6) trial counsel was ineffective for failing to hire an expert witness, (7) the trial court erroneously allowed admission of Petitioner's telephone calls from jail, and (8) Petitioner's appellate counsel was ineffective.

The Court finds that Petitioner's claims are without merit. Therefore, the petition will be denied. The Court will also deny Petitioner a certificate of appealability, but it will grant him permission to proceed on appeal in forma pauperis.

## I. Background

This case involves the March 20, 2006, fatal shooting of nineteen-year-old William Calhoun at a residential address in Detroit. Calhoun was standing on his girlfriend's porch when he was shot by one of two men trying to force their way into the house.

Prior to trial, the prosecutor filed a motion to admit statements made by Petitioner on the telephone while he was in jail. On the recording Petitioner said he had an alibi and everything would work out if he and the other man involved in the shooting could get their stories straight. The trial court ruled the statements were only admissible for impeachment purposes if Petitioner testified. The prosecutor filed an interlocutory appeal in the Michigan Court of Appeals, but relief was denied. *People v. Davis*, No. 273422

2

(Mich. Ct. App. Aug. 21, 2006).The prosecutor then filed an application for leave to appeal in the Michigan Supreme Court. That court remanded the case back to the Michigan Court of Appeals as on leave granted. *People v. Davis*, 721 N.W.2d 584 (2006) (Table). The Michigan Court of Appeals then reversed the trial court, and it held the statements could be admitted as substantive evidence against Petitioner. *People v. Davis*, No. 273422, 2007 WL 1720006 (Mich. Ct. App. June 14, 2007). Petitioner did not seek leave to appeal this decision to the Michigan Supreme Court, and the case returned to the trial court.

Two judges–Judge Hathaway and Judge Townsend–presided over parts of Petitioner's trial. Judge Hathaway presided over the jury selection proceedings as well as the reception of the evidence. At the end of the second day of trial, Judge Hathaway informed the jurors she would not be presiding over the rest of the trial because of an undisclosed family emergency. Judge Townsend then presided over closing arguments, jury instructions, jury deliberations, and the verdict.

At trial, the evidence showed that during the evening of the shooting a heated argument erupted at Petitioner's house between the victim's girlfriend–Goldie Stanfeld– and one of Petitioner's relatives. After Stanfeld left, Petitioner's wife called him and informed him about the argument. She told him a large group of people were trying to get back inside their home.

Petitioner later told police officers he arrived back at his house within five or ten minutes after the phone call. He then walked down the street with his cousin–Ramon

3

Flood–intending to speak with Octavius Johnson–Stanfeld's cousin–regarding the argument. Petitioner told police he picked up "a nice long stick" for protection, and he was carrying the stick at his side in a way that might have appeared to be a long gun.

Petitioner explained that when he arrived at the victim's house he insisted on entering to speak to Johnson, but the victim stood in front of the door and would not permit him to enter. According to Petitioner, Flood then punched the victim, and the victim appeared to reach for a gun hidden in his waist as he began to fall. Petitioner then saw Flood shoot the victim, and then they both ran away.

Stanfeld, on the other hand, testified both Petitioner and Flood were carrying guns as they approached the porch. She explained that as the three men stood on the porch arguing, Flood punched the victim in the face, and the victim punched Flood back. Stanfeld then saw Petitioner shoot the victim, and then the two men ran away. Two other eyewitnesses–Christina Peoples and Amanda Davis–testified that they were standing just inside the front door of the home, and they also saw Petitioner shoot the victim. Their account of the incident largely corroborated Stanfeld's account.

Stanfeld's mother immediately called 9-1-1. The tape of the call was played for the jury. On the tape, Stanfeld's mother identified Petitioner as the shooter, and unidentified female voices in the background also identified Petitioner as the shooter. Stanfeld's mother later told police officers that she personally saw Petitioner shoot the victim. At trial, however, she admitted she did not see the shooting herself, but she heard the other eyewitnesses identify Petitioner as the shooter immediately after it occurred.

4

Police officers and EMS personnel responded to the scene. A bullet hole was found about four and one-half feet high on the frame of the house near the front door. An evidence technician determined that the bullet traveled at an upward angle into the house, and when he dug the bullet out of the hole he saw it had blood on it.

The medical examiner testified that the victim had been shot a single time at close range. The bullet entered his chest, traveling at a downward angle through his body and exiting the back. The medical examiner testified that if the bullet recovered from the wood frame of the house was the bullet that killed the victim, it would indicate the victim was bent over when he was shot. The victim also had one laceration on his ear and another behind his ear, the cause of which could not be determined. On cross-examination the medical examiner testified that there was no evidence of more than one bullet wounding the victim.

While in custody and waiting trial, Petitioner made several telephone calls from jail that were recorded. In one of these recordings Petitioner mentioned a possible alibi for the events of March 20, 2006, despite the fact he told police he was present at the scene but that Flood shot the victim. In another statement he talked about getting Flood to cooperate, stating "what we gonna have to say gonna have to match up," and Flood could say "self-defense. That n****r have the gun, he got it took from him, or they struggle with the mother f****r." Dkt. 10-13, p.143; Dkt. 10-14, pp. 10-11.

After closing and rebuttal arguments, Judge Townsend made several rulings regarding jury instructions. In addition to ruling that second-degree murder was a

5

mandatory lesser included offense of first-degree murder, the court also denied defense counsel's request for a "mere presence" jury instruction. The court also denied defense counsel's request to include a self defense instruction.

The jury found Petitioner guilty of the offenses indicated above.

Following his conviction and sentence, Petitioner filed a direct appeal in the Michigan Court of Appeals. His brief on appeal, filed by appointed counsel, raised the following claims:

> I. Judge Townsend erroneously ruled that 2nd degree murder was a mandatory lesser included offense of a 1st degree murder charge, and further compounded the error because the evidentiary record did not support a 2nd degree charge.
>
> II. Defense counsel was constitutionally ineffective when he agreed to allow a substitute judge to preside over closing statements, jury instructions, jury deliberations, and the jury verdict where a different judge had presided over voir dire, opening statements, and all witness testimony where there was no showing that the original judge could not have temporarily postponed the trial proceedings.
>
> III. The prosecutor violated Mr. Davis's due process right to a fair trial by (1) accusing defense counsel of intentionally creating evidence and (2) improperly referring to Mr. Davis's Fifth Amendment right not to testify.

The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished opinion per curiam. *People v. Davis*, No. 287476, 2010 WL 571832 (Mich. Ct. App. Feb. 18, 2010).

Petitioner then filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims. The Michigan Supreme Court denied the application by form order. *People v. Davis*, 784 N.W.2d 808 (Mich. 2010) (Table). Petitioner then filed

6

a petition for a writ of certiorari in the United States Supreme Court, but it was also

denied. *Davis v. Michigan*, 562 U.S. 1149 (2011).

Petitioner returned to the trial court and filed a motion for relief from judgment,

raising the following claims:

> I. Appellate counsel provided ineffective assistance establishing "good cause" by failing to raise these issues on direct appeal.
>
> II. Trial counsel provided ineffective assistance establishing "actual prejudice when he (a) failed to request a continuance to investigate exculpatory eyewitness and (b) failed to present exculpatory physical evidence and last (c) failed to object to prosecutorial misconduct.
>
> III. Trial counsel was constitutionally ineffective for requesting MRE 106 completion of writings and recordings without redacting a portion that was racial toward the jury.
>
> IV. The trial court erroneously admitted into evidence irrelevant emergency 911 phone calls as an excited utterance exception to the hearsay rule over the objection of trial counsel.
>
> V. The trial courts denial of new trial motion was an abuse of discretion when compounded by the trial courts refusal to hear the merits of the claim establishes "good cause" for the issues not being raised on appeal for weight of the evidence.

The motion was accompanied by an affidavit executed by Rudy Thomas. Thomas

stated in the affidavit that he was in a jail cell with Petitioner and Flood on November 7,

2007, awaiting transport to court. Thomas heard Flood tell Petitioner that he would testify

that he shot the victim either in self defense or by accident after he wrestled the victim's

gun away from him during the fight. Thomas also heard Flood say that he did not turn

himself in following the shooting because he thought the police would kill him as the

victim was a relative of Detroit Mayor Kwamye Kilpatrick. Petitioner attached his own affidavit to the motion recounting the same conversation, and asserting that he asked his trial counsel to contact Flood about testifying.

On March 13, 2012, the trial court issued an opinion and order denying the motion for relief from judgment. The court found that the claims lacked merit, and it also found that Petitioner failed to demonstrate good cause or actual prejudice to excuse his failure to raise these claims on direct appeal as required by Michigan Court Rule 6.508(D)(3).

Petitioner filed a delayed application for leave to appeal in the Michigan Court of Appeals. The Michigan Court of Appeals denied the application for leave to appeal for failure to establish entitlement to relief under Rule 6.508(D). *People v. Davis*, No. 312326 (Mich. Ct. App. May 30, 2013). Petitioner filed an application for leave to appeal in the Michigan Supreme Court, but it was also denied under Rule 6.508(D). *People v. Davis*, 839 N.W.2d 464 (Mich. 2013) (Table).

## II. Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,

8

as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in
the State court proceeding.

A state court adjudication is "contrary to" Supreme Court precedent under §
2254(d)(1) "if the state court applies a rule that contradicts the governing law set forth in
[Supreme Court] cases" or "if the state court confronts a set of facts that are materially
indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a
[different result]." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (internal quotation marks
omitted).

Under the "unreasonable application" clause of § 2254(d)(1),

even clear error will not suffice. Rather, as a condition for obtaining habeas
corpus from a federal court, a state prisoner must show that the state court's
ruling on the claim being presented in federal court was so lacking in
justification that there was an error well understood and comprehended in
existing law beyond any possibility for fairminded disagreement.

*White v. Woodall*, ___ U.S. ___, 134 S. Ct. 1697, 1702, 188 L. Ed. 2d 698 (2014)
(citations, quotation marks, and alterations omitted).

"When reviewing state criminal convictions on collateral review, federal judges
are required to afford state courts due respect by overturning their decisions only when
there could be no reasonable dispute that they were wrong." *Woods v. Donald*, ___ U.S.
___, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015). "Federal habeas review thus exists
as 'a guard against extreme malfunctions in the state criminal justice systems, not a
substitute for ordinary error correction through appeal.'" *Id*. (quoting *Harrington v.*

9

*Richter*, 562 U.S. 86, 102-03 (2011)). "[W]hether the trial judge was right or wrong is not the pertinent question under AEDPA." *Renico v. Lett*, 559 U.S. 766, 778 n.3 (2010). The question is whether the state court's application of federal law was "objectively unreasonable." *White*, 134 S. Ct. at 1702. In short, the standard for obtaining federal habeas relief is "difficult to meet . . . because it was meant to be." *Burt v. Titlow*, ___ U.S. ___, 134 S. Ct. 10, 16, 187 L. Ed. 2d 348 (2013)(internal quotation marks omitted).

### III. Analysis

A. Procedural Default

Respondent asserts that several of Petitioner's claims are barred from review by his state court procedural defaults. Petitioner counters that Respondent waived this affirmative defense by not raising it in his motion for summary judgment. Petitioner also asserts that any state court defaults are excused because he received the ineffective assistance of appellate counsel.

The Court will proceed directly to the merits of Petitioner's claims without consideration of whether any of Petitioner's claims are procedurally defaulted because the claims lack substantive merit and a procedural-default analysis "adds nothing but complexity to the case." *Babick v. Berghuis*, 620 F.3d 571, 576 (6th Cir. 2010).

B. Ineffective Assistance of Trial Counsel

 Petitioner's first, second, and sixth habeas claims allege that he was deprived of the effective assistance of trial counsel. His first and third claims were raised in his motion for relief from judgment, and the trial court rejected these claims on the merits as

an alternative basis for its decision. Petitioner's second claim was raised in his direct appeal, and the Michigan Court of Appeals denied relief on the merits. These state court merit adjudications of Petitioner's claims did not unreasonably apply clearly established Supreme Court law. Habeas relief is therefore foreclosed under § 2254(d)(1).

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), is clearly established federal law for purposes of Petitioner's ineffective assistance of counsel claims. *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). Under *Strickland*, a defendant must show that his trial attorney's "performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id*.

The "deficient performance" prong of the *Strickland* test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689.

> A fair  assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id*. (internal citation omitted).

To demonstrate that counsel's performance prejudiced the defense, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 111-12 (quoting *Strickland*, 466 U.S. at 693). The Supreme Court's holding in *Strickland* places the burden on the defendant who raises a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly deficient performance. See *Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

The Supreme Court has confirmed that a federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (internal and end citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential

12

standard." *Id*.

    1. Failure to Interview Ramon Flood

    Petitioner's lead claim asserts that his trial counsel was ineffective for failing to call Ramon Flood to testify in his defense after Flood told Petitioner that he was willing to testify that he was the shooter. Petitioner asserts that his counsel refused to call Flood because he thought Flood would be appointed counsel and invoke his Fifth Amendment right against self-incrimination. Petitioner asserts that it was ineffective for counsel to make this assumption without at least first speaking with Flood, who Petitioner asserts told him while they were in jail that he would testify. Petitioner says he told his trial counsel during the second day of trial that Flood was in lock-up and ready to testify, but his counsel told him that "it was too late now" to call Flood.

    Petitioner first made these allegations during his allocution at the sentencing hearing. His counsel responded by asserting "I explained to Mr. Davis that [Flood] would have a Fifth Amendment right, and that he would have a right to counsel, and there's no way he's gonna get on the stand and confess that he was the one that did it." Dkt 10-16, pp. 14-15. Petitioner seeks an evidentiary hearing in this Court to make a testimonial record regarding these allegations.

    As an initial matter, Petitioner is not entitled to a hearing.  In *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011), the Supreme Court held that review under § 2254(d)(1) is limited "to the record that was before the state court that adjudicated the claim on the merits." *Id*. Federal courts are prohibited from considering newly presented evidence as it

pertains to a claim that was adjudicated on the merits in state court. *Id*. Here, the trial court adjudicated this allegation of ineffective assistance of counsel on the merits. It found that the claim lacked merit essentially because his counsel reasonably informed Petitioner that he would not call Flood to testify because of Flood's Fifth Amendment right against self-incrimination.

The trial court's decision was reasonable. The Court notes that Petitioner supports his claim with an affidavit from himself and another prisoner who overheard Flood's remarks, but he failed both in state court and here to support his claim with an affidavit from Flood himself. This is telling. There is no reasonable probability that Flood would have testified at trial after receiving the advice of counsel despite what he told Petitioner in jail when Petitioner has not even been able to produce a written statement or affidavit from Flood himself.

That is, even accepting as true the allegations that Flood told Petitioner and another prisoner in jail that he would testify, a reasonable jurist could nevertheless reasonably conclude that there is no reasonable probability that the outcome of the Petitioner's trial would have been more favorable had counsel actually called Flood to testify. It is one thing for a person to tell his cousin in jail that he will come to his aid at trial and take responsibility for a crime, but is quite another for that person to actually get on the witness stand and expose himself to prosecution for murder after receiving the advice of counsel. Here, Petitioner has not even shown that Flood is willing to repeat his statements in an affidavit, let alone testify in court that he shot the victim.

14

As defense counsel explained during the sentencing hearing when this allegation
was first raised by Petitioner, there is little chance that Flood would have testified to
shooting the victim–even if he said he would to Petitioner in jail. Had counsel called
Flood to testify, he would have been appointed counsel who would have informed him
about his Fifth Amendment right against self-incrimination. In all probability, Flood's
counsel would have advised him not to testify that he shot the victim since the prosecutor
obviously viewed the shooting as a murder. Given the lack of evidence proffered to the
state court in support of this claim, it was reasonable for the state court to deny it.

2. Failure to Object to Substitution of Trial Judges

Petitioner next asserts that his trial counsel was ineffective for failing to object to
the substitution of trial judges after the close of proofs. Petitioner asserts that the
substitution resulted in unfair prejudice because Judge Townsend instructed the jury on
the lesser offense of second-degree murder and refused to give a mere presence defense
instruction without having heard the evidence.

This claim was rejected during Petitioner's direct appeal by the Michigan Court of
Appeals as follows:

> The record discloses that Judge Hathaway was unable to finish the
> trial because of a family emergency and, with the consent of defense
> counsel, Judge Townsend presided over closing arguments and jury
> instructions. As noted by defendant, MCR 6.440(A) provides:
>
>> If, by reason of death, sickness, or other disability, the judge
>> before whom a jury trial has commenced is unable to continue
>> with the trial, another judge regularly sitting in or assigned to
>> the court, *on certification of having become familiar with the*

15

*record of the trial, may proceed with and complete the trial.* [Emphasis in original].

In the present case, the record fails to show the certification required by MCR 6.440(A).

In *People v. McCline*, 442 Mich. 127, 132-133; 499 N.W.2d 341 (1993), our Supreme Court agreed with the general rule that "a judge may not be substituted to preside over the remainder of a trial after evidence has been adduced before the original judge (quotation marks and citation omitted)."

This rule is designed to ensure "that the judge who hears the testimony as to the facts also applies the law thereto." *Id*. at 132. In *McCline*, however, the Court concluded that reversal was not required where the substitution occurred after jury voir dire, before any evidence was taken, and the defendant failed to show any prejudice. *Id*. at 134. See also *People v. Bell*, 209 Mich. App. 273, 275; 530 N.W.2d 167 (1995) (holding that a harmless error analysis applies to an improper substitution of a judge at trial).

In this case, defense counsel expressly consented to the substitution. Although defendant complains that Judge Townsend failed to certify that he had become familiar with the record, Judge Hathaway indicated on the record that she had spoken to Judge Townsend about the case. Further, the decision whether to object on this basis was a matter of trial strategy. *People v. Matuszak*, 263 Mich. App. 42, 58; 687 N.W.2d 342 (2004).

Defense counsel may have consented to the substitution for a variety of strategy reasons. For example, he may have consented because defendant had been in custody since March 2006, or because he felt that the trial had gone well and he did not want the jury to forget any details in the event of a delay. He may also have believed that Judge Townsend might make favorable rulings on issues that might arise during closing arguments and jury instructions. We cannot divine defense counsel's thinking. From the available record, however, there is no basis for concluding that counsel's decision was a serious error rather than sound trial strategy.

Further, to prevail on an ineffective assistance of counsel claim, defendant must show that counsel's alleged error resulted in prejudice. *People v. Kimble*, 470 Mich. 305, 314; 684 N.W.2d 669 (2004). While

16

defendant refers to several rulings made by Judge Townsend, he only argues that two were erroneous: (1) his refusal to give a mere presence instruction, and (2) his decision to give a second degree murder instruction.

As discussed previously, it was proper for Judge Townsend to instruct the jury on second-degree murder as a lesser offense of first-degree murder because the instruction was supported by a rational view of the evidence. Further, although defendant requested a mere presence instruction, CJI2d 8.5, that instruction is only applicable to an aiding and abetting theory of guilt. Here, defendant was not charged as an aider and abettor and the prosecutor did not argue an aiding and abetting theory of guilt. Rather, the prosecutor's theory at trial was that defendant was the shooter, consistent with the testimony of all eyewitnesses. Moreover, at defendant's request, because defendant was only charged as a direct principal, Judge Townsend instructed the jury that in order to convict defendant, "you must find that he is the person who fired the shots, that, that committed the offense." Thus, defendant could not have been convicted if the jury was not convinced beyond a reasonable doubt that he was the person who shot the victim.

Accordingly, defendant has failed to show that he was prejudiced by defense counsel's decision to consent to Judge Townsend's substitution during closing arguments and jury instructions.

*Davis*, 2010 WL 571832, at *3–4.

This decision was not an unreasonable application of the *Strickland* standard. As the Michigan Court of Appeals correctly explained, there was no right to automatic reversal due to the substitution, even absent the certification required by state law.

Moreover, Petitioner completely fails to demonstrate that he was actually prejudiced by the substitution. Petitioner asserts that the late substitution resulted in two errors during the jury instructions, but the state appellate court found that as a matter of state law the jury was properly instructed on the lesser offense of second-degree murder and was properly not instructed on mere presence. As explained below, this Court cannot

17

second-guess the correctness of the state court ruling regarding what jury instructions are required by state law. Therefore, Petitioner has failed to demonstrate *Strickland* prejudice or that the state adjudication of this claim was unreasonable.

3. Failure to Call Expert Witness

Petitioner asserts that his counsel was ineffective for failing to call an expert witness regarding the trajectory of the bullet that killed the victim and to demonstrate that the bullet recovered from the house was the bullet that killed the victim.

The medical examiner testified that the bullet struck the victim in the chest and traveled in a downward trajectory and exited the victim's back. The defense argued that the victim therefore must have been bent over significantly during the tussle with Flood, and that the bullet must have been fired at an upward angle in relation to the ground corresponding to Flood's lower position on the porch during the fight. Petitioner argues that if a defense expert had been hired and found cloth residue on the bullet recovered from the house, it would have undermined the prosecutor's suggestion that the bullet dug out of the house came from a second shot that grazed the victim's head.

This claim was raised by Petitioner in his motion for relief from judgment. The trial court rejected the claim on the merits with no analysis, simply noting that it would not substitute its judgment for that of counsel's on whether to call an expert witness.

The trial court's summary merits adjudication was reasonable. The defense in this case was that Flood was the shooter. Defense counsel presented this argument during cross-examination of the medical examiner by eliciting testimony supporting his theory

18

that the angle of the shot showed that it was more likely that Flood was the shooter during his fight with the victim. Defense counsel then made this argument quite forcefully during closing argument by referring to the angle of the wound, the angle the bullet entered the house, and the relative position of the three men on the porch.

In response to this argument, and for the first time during the criminal proceedings against Petitioner, the prosecutor suggested that perhaps the bullet that entered the frame of the house was a second shot that grazed the victim's head. The prosecutor recalled the medical examiner's testimony that the victim also had abrasions on the right side of his head and ear.

Petitioner claims that this rebuttal argument could have been foreclosed had his trial counsel hired an expert to examine the bullet found in the house, and had the bullet revealed residue from the victim's clothing. Petitioner notes that while the prosecutor could explain the presence of blood on the bullet due to the abrasions on the victim's head, she could not have explained the presence of cloth, had any been found.

This hindsight allegation of ineffective assistance of counsel is meritless. Before the prosecutor came up with this last-minute theory of a second shot that grazed the victim during her rebuttal argument, no reasonable defense attorney would have thought it necessary to test the bullet for cloth residue. Frankly, the prosecutor's rebuttal argument was incredibly weak and unnecessary. On cross-examination, defense counsel asked the medical examiner how many bullets wounded the victim, and the medical examiner indicated that a single bullet caused the victim's wounds. See Dkt. 10-13, p. 18. Although

19

the medical examiner testified that he could not determine the cause of the abrasions, the prosecutor never asked whether they might have been caused by a second bullet. Accordingly, the prosecutor's rebuttal theory had practically no support in the evidence.

Having reviewed the record, the Court finds that even had Petitioner conclusively proven that the bullet found in the frame of the house was the fatal one, either by expert testimony or otherwise, there is no reasonable probability that the outcome of the trial would have been different. Again, until the prosecutor first made the contrary suggestion in rebuttal, there was no dispute but that the bullet found in the house frame was the fatal one. It had blood on it, and the medical examiner testified that if the victim had been bent over when shot, his wounds would have been consistent with it. The jury almost certainly rejected the defense theory that Flood was the shooter, not because of the unsupported rebuttal argument, but because of the three eyewitnesses who identified Petitioner as the shooter. The eyewitnesses identifications were especially compelling given the fact that they were supported by the statements identifying Petitioner heard on the 9-1-1 tape.

Simply stated, the prosecutor need not have made the unsupported argument that a different bullet killed he victim, and there is no reasonable probability that it played a significant role in the outcome of Petitioner's trial. Therefore, the Court finds that Petitioner's trial counsel was not ineffective for failing to anticipate this argument and hire an expert witness who may have or may not have been able to rebut it. The summary denial of this claim on the merits did not unreasonably apply the *Strickland* standard.

C. Prosecutorial Misconduct

Petitioner's third claim asserts the prosecutor committed misconduct during her rebuttal argument. Petitioner asserts that the prosecutor violated Petitioner's Fifth Amendment right to remain silent by suggesting that defense counsel "put everyone on trial but his client." He also argues that the prosecutor repeatedly disparaged defense counsel by asserting that she had "created evidence" and "insulted" the jury's intelligence.

The United States Supreme Court has made clear that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's conduct or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); see also *Darden v. Wainwright*, 477 U.S. 168, 181(1986) (citing *Donnelly*); *Parker v. Matthews*, ___U.S.___ , 132 S. Ct. 2148, 2153, 183 L. Ed. 2d 32 (2012) (confirming that *Donnelly/Darden* is the proper standard). "[T]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because constitutional line drawing in prosecutorial misconduct cases is necessarily imprecise." *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (internal quotation marks and alterations omitted). Indeed, because "the *Darden* standard is a very general one," courts have "more leeway . . . in reaching outcomes in case-by-case determinations." *Parker*,

21

132 S. Ct. at 2155 (internal quotation marks omitted).

In *Griffin v. California*, 380 U.S. 609 (1965), the Supreme Court held that neither the trial court nor the prosecutor may invite the jury to infer guilt from the defendant's decision not to testify. They may not "solemnize . . . the silence of the accused into evidence against him," 380 U.S. at 614, or "suggest . . . to the jury that it may treat the defendant's silence as substantive evidence of guilt." *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976) (emphasis added).

Here, read in context, the prosecutor was not commenting on Petitioner's failure to testify or prove his innocence. Rather, the prosecutor was responding to defense counsel's argument that Flood was the shooter and that the eyewitnesses were not credible. Defense counsel's closing argument largely focused on Flood, and how the forensic evidence showed Flood was in a more likely position to be the shooter, and why the eyewitnesses were mistaken as to their identification. This is what the prosecutor meant by defense counsel "putting everyone else on trial" but Petitioner. The challenged remarks did not refer to Petitioner's decision not to testify and did not violate Petitioner's Fifth Amendment rights.

With respect to Petitioner's second allegation, "a prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly excessive or do not impair the search for the truth." *United States v. August*, 984 F.2d 705, 715 (6th Cir. 1992). Indeed, such comments are usually not improper because the prosecution "necessarily has wide latitude during closing

argument to respond to the defense's strategies, evidence and arguments." *Bedford v.*
*Collins*, 567 F.3d 225, 233 (6th Cir. 2009).

Here, as discussed above, the prosecutor responded to defense counsel's argument
that the trajectory of the bullet proved that only Flood could have shot the victim by
latching on to the theory that the bullet found in the house grazed the victim's head.
During this rather weak portion of the rebuttal, the prosecutor also characterized defense
counsel's statement that the found bullet was the fatal bullet as something that defense
counsel created. Of course, defense counsel neither created evidence nor insulted the
jury's intelligence by asserting that the bullet found in the house frame killed the victim.
It was a theory based on the evidence presented by the medical examiner and the officer
who dug the bullet out and saw blood on it. While the prosecutor's response was
somewhat overzealous, if not a bit ridiculous, it was not so overly excessive so as to
render the trial fundamentally unfair. It was not unreasonable for the state court to reject
this claim on the merits.

D. Admission of 9-1-1 call

Petitioner asserts that the 9-1-1 call was erroneously admitted as an excited
utterance in violation of state evidentiary law. He asserts that the caller identifying
Petitioner as the shooter was not speaking from personal knowledge but was only
relaying information that she was receiving from unidentified persons speaking in the
background. Respondent largely contends that the claim is not cognizable because it only
asserts a violation of state evidentiary law. In reply to Respondent's answer, Petitioner

23

notes that he asserted in the state courts that admission of this evidence implicated his constitutional rights under the Confrontation Clause of the Sixth Amendment as well as his right to fair trial under the Fourteenth Amendment.

First, to the extent Petitioner does argue that the 9-1-1 tape was admitted in violation of state evidentiary law, "'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'" *Ege v. Yukins*, 485 F.3d 364, 375 (6th Cir. 2007) (quoting *Estelle*, 502 U.S. at 67-68). "The standard of review is therefore very deferential on such claims." *Hudson v. Lafler*, 421 F. App'x 619, 627 (6th Cir. 2011). An evidentiary ruling may violate due process only where it "is so egregious that it results in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Whether an error in the admission of evidence "constitutes a denial of fundamental fairness turns upon whether the evidence is material in the sense of a crucial, critical[,] highly significant factor." *Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000).

The trial court determined that the 9-1-1 calls were properly admitted as an excited utterance under Michigan Rule of Evidence 803(2) when it denied Petitioner's motion for relief from judgment. See Dkt. 10-26, pp. 13-15. Petitioner fails to show that the purported evidentiary error rose to the level of a federal constitutional claim warranting relief. "[U]nfair prejudice does not mean the damage to a defendant's case that results from the legitimate force of the evidence; rather it refers to evidence which tends to suggest [a] decision on an improper basis." *United States v. Lawson*, 535 F.3d 434, 442 (6th Cir. 2008) (internal quotation marks and citation omitted). The 9-1-1 tape was

24

probative of the circumstances of the crime because besides the excited utterances of the caller, it also contained present sense impressions of eyewitnesses identifying Petitioner as the shooter immediately after the shooting occurred. The admission of the tape did not suggest a decision on an improper basis. Therefore, the state court's admission of this evidence was reasonable and did not result in a denial of fundamental fairness.

With respect to the federal aspect of this claim, only out-of-court statements that are testimonial in nature are barred by the Confrontation Clause of the Sixth Amendment. See *Crawford v. Washington*, 541 U.S. 36 (2004). The Confrontation Clause is not implicated, and thus does not need not be considered, when non-testimonial hearsay is at issue. See *Davis v. Washington*, 547 U.S. 813, 823-26 (2006).

In *Davis*, the Supreme Court ruled that statements taken by police officers during the course of police questioning are considered "nontestimonial," and not subject to the Confrontation Clause, when they are made "under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id*. at 822.

The Supreme Court held in *Davis* that statements made by a domestic abuse victim in response to a 9-1-1 operator's questions while the defendant was inside her home in violation of a no-contact order, in which the victim identified her assailant, were not "testimonial" and, therefore, were not subject to the Confrontation Clause, because the victim was speaking about events as they were actually happening, rather than describing past events, and the primary purpose of the 9-1-1 operator's interrogation was to enable

25

police assistance to meet an ongoing emergency caused by a physical threat to the victim. *Id*. at pp. 826-28. In so ruling, the Supreme Court noted "a 9-1-1 call . . . and at least the initial interrogation conducted in connection with a 9-1-1 call, is ordinarily not designed primarily to "establis[h] or prov[e]" some past fact, but to describe current circumstances requiring police assistance." Id. at p. 827.

In the present case, the caller was on the phone immediately after a shooting had occurred on her porch. Other people were heard in the background, and at that time it was not known whether the caller and other occupants of the house were still in danger. Therefore, the statements made to the 9-1-1 operator and the statements heard in the background were non-testimonial because they were made in the context of an ongoing emergency. Hence, the admission of the tape did not violate Petitioner's Confrontation Clause rights. This claim is without merit.

E. Second-Degree Murder Jury Instruction

Petitioner asserts that contrary to Michigan law, the trial court thought it was obligated to instruct the jury on the lesser charge of second-degree murder. Petitioner asserts that the intent element for first-degree murder was never disputed at trial, and therefore the jury should never have been given the option of finding Petitioner guilty of the lesser charge as they did.

The Michigan Court of Appeals found that it was error for the trial court to rule that a second-degree murder instruction was automatically required, but it found that the instruction was nevertheless properly read under state law because it was supported by a

26

rational view of the evidence:

> In this case, the evidence showed that defendant carried a weapon to Goldie Stanfield's house, but that defendant did not go to the house looking for the victim. Instead, he demanded to see Octavious Johnson. Further, the eyewitnesses testified that defendant did not shoot the victim until after the victim began fighting with defendant's cousin, Ramon Flood. A jury could rationally conclude from the evidence that although defendant shot the victim with the intent to kill or the intent to cause great bodily harm, he did not go to Stanfield's home with a premeditated plan to kill the victim. The jury could also rationally conclude that defendant did not formulate an intent to shoot the victim until after the victim began fighting with Flood, before defendant had an opportunity to premeditate. Thus, the intent element differentiating first-degree premeditated murder from second-degree murder was in substantial dispute, and a second-degree murder conviction was supported by a rational view of the evidence. Therefore, although the trial court erroneously believed that an instruction on second-degree murder was mandatory, the court did not err in instructing the jury on that offense because the instruction was supported by a rational view of the evidence. Accordingly, appellate relief is not warranted because defendant's substantial rights were not affected.

*Davis*, No. 287476, 2010 WL 571832, at *2.

Generally, challenges to jury instructions are not cognizable on federal habeas review unless the instruction "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. 62, 72 (1991) (citation and quotation marks omitted). It is not enough to show that an instruction was incorrect under state law. *Id.*, at 71-72. "To warrant habeas relief, jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair." *Doan v. Carter*, 548 F.3d 449, 455 (6th Cir. 2008) (citations omitted). "When a court makes an error in instructing the jury, the proper inquiry is 'whether there is a reasonable likelihood that the jury' applied the instruction 'in an unconstitutional manner.'" *Id.*, at 455 (quoting *Victor v. Nebraska*, 511 U.S. 1, 6 (1994)). Here, Petitioner has not

demonstrated that the challenged instruction was incorrect under state law, much less that it rendered the entire trial fundamentally unfair. Despite the fact that the defense did not dispute the intent element for first-degree murder and instead focused on arguing that Petitioner was not the shooter, as aptly articulated by the state appellate court, the jury could rationally find that the killing was not premeditated, and therefore the instruction did not render the entire trial fundamentally unfair. The state appellate court's treatment of this issue did not contravene or unreasonably apply federal law.

F. Admission of Jailhouse Phone Calls

Petitioner argues that the Michigan Court of Appeals erred in holding that his jailhouse statements on the phone were admissible as a party admission under Michigan Rule of Evidence 801(d)(2)(A) and relevant to show consciousness of guilt as a false exculpatory statements. Similar to Petitioner's argument regarding the admission of the 9-1-1 tape, this claim only asserts a non-cognizable error of state law. Nor has Petitioner pointed to any controlling federal law establishing that admission of such jailhouse statements suggesting consciousness of guilt can render a trial fundamentally unfair. Accordingly, this claim does not provide a cognizable basis for granting habeas relief.

G. Ineffective Assistance of Appellate Counsel

Finally, Petitioner asserts that his appellate counsel provided ineffective assistance during Petitioner's direct appeal. Specifically, Petitioner argues that his appellate counsel should have supported a motion for an evidentiary hearing with an offer of proof from Rudy Thomas, as Petitioner has done in the present petition. Petitioner also claims that

28

appellate counsel was ineffective for failing to raise the claims that Petitioner raised in his state post-conviction review proceeding. Because this Court has found the underlying claims to be without merit, Petitioner cannot show that he was prejudiced by his appellate counsel's failure to raise or support the claims during his direct appeal. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir.), cert. denied sub nom *Coley v. Robinson*, 134 S. Ct. 513, 187 L. Ed. 2d 371 (2013).

The petition will therefore be denied because none of Petitioner's claims merit relief.

## IV. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings, which was amended as of December 1, 2009, requires that a district court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant. . . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Rule 11, Rules Governing Section 2254 Proceedings. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Courts must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P.

22(b); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997).

To receive a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotes and citations omitted). Here, jurists of reason would not debate the Court's conclusion that Petitioner has not met the standard for a certificate of appealability because his claims are completely devoid of merit. Therefore, the Court denies a certificate of appealability.

The Court will, however, grant permission to appeal in forma pauperis because any appeal of this decision could be taken in good faith. 28 U.S.C. § 1915(a)(3).

## V. Conclusion

Accordingly, the Court 1) **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus, 2)  **DENIES** a certificate of appealability, and 3) **GRANTS** permission to appeal in forma pauperis.

**SO ORDERED.**

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  February 29, 2016

30

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 29, 2016.

s/Deborah Tofil
Case Manager